UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

V.T., on behalf of, J.P.,

                Plaintiff,

    -against-

LIFE'S WORC, INC., ANDREA DIVITA,
AYODELE ADEWUNMI, TIFFANY LABOY,
VANESSA DOMINGUEZ, BRYAN AMEGAH,
RAMON PAULINO, ZAMEL BANKS,
DEVONNIE DAVIS,

                Defendants.

No. _____

**COMPLAINT & JURY DEMAND**

---

### LIFE'S WORC SYSTEMATICALLY ABUSED, OVERMEDICATED, AND NEGLECTED A NON-VERBAL AUTISTIC MAN

1.    J.P. is a severely autistic and nonverbal adult who requires 24/7 care and supervision for every aspect of daily life, including eating, bathing, toileting, mobility, and communication. He is entirely dependent on others for his safety, medical care, and quality of life.

2.    For several years, J.P. resided at Life's WORC's East Islip group home, where Defendant Life's WORC was responsible for his day-to-day care, behavioral support, medical oversight, and overall protection.

3.    Rather than receiving the dignity and safety required by federal and New York State law, J.P. was subjected to repeated physical assaults, emotional abuse, chronic overmedication so that staff could avoid "dealing" with his disabilities, willful neglect, and institutional cover-ups by both staff and upper-level management at Life's WORC.

4.      Life's WORC conduct violated federal law, New York State law, and basic notions of human decency. Its actions were not isolated or due to the rogue acts of staff members—Life's WORC's conduct was systemic, deliberate, and calculated to protect the institution over the vulnerable person it was charged to protect.

## PARTIES

5.      Plaintiff J.P. is a severely autistic adult man residing in Queens, New York. He is nonverbal and requires 24/7 care and assistance with daily living activities. His mother, Plaintiff V.T., serves as his guardian ad litem.

6.      Defendant Life's WORC, Inc. ("Life's WORC") is a not-for-profit corporation organized under the laws of the State of New York, with its principal place of business located in Garden City, New York. Life's WORC provides residential services to individuals with intellectual and developmental disabilities, including those with autism.

7.      Defendant Andrea Divita, at all relevant times, was Life's WORC's Senior Vice President of Residential Services and was responsible for hiring, training, and supervising staff members in order to ensure that they provided appropriate disability care.

8.      Defendant Ayodele Adewunmi, at all relevant times, was Life's WORC's Director of Residential Services and was responsible for hiring, training, and supervising staff members in order to ensure that they provided appropriate disability care. Defendant Adewunmi was also responsible for supervising the medication management of residents. As described below, after the abuse of J.P. came to light and was reported in the news, Adewunmi was instrumental in the cover-up of that abuse. As a reward for his loyalty, Life's WORC thereafter promoted him to Vice President of Autism Services.

9.     Defendant Tiffany LaBoy, at all relevant times, was Life's WORC's Residential Manager of the East Islip group home and was responsible for hiring, training, and supervising staff members in order to ensure that they provided appropriate disability care. Defendant LaBoy was also responsible for supervising the medication management of residents.

10.     Defendant Vanessa Dominguez, at all relevant times, was Life's WORC's Assistant Residential Manager of the East Islip group home and was responsible for hiring, training, and supervising staff members in order to ensure that they provided appropriate disability care. Defendant Dominguez was also responsible for supervising the medication management of residents.

11.     Defendants DiVita, Adewunmi, LaBoy, and Dominguez are collectively referred to herein as the "Supervisory Defendants."

12.     Defendant Bryan Amegah, at all relevant times, was an Autism Support Professional ("ASP") employed by Life's WORC and assigned to the East Islip group home. He was responsible for providing disability care to J.P., including in one-on-one shifts where he was responsible for attending to all of J.P.'s basic needs.

13.     Defendant Ramon Paulino, at all relevant times, was an ASP employed by Life's WORC and assigned to the East Islip group home. He was responsible for providing disability care to J.P., including in one-on-one shifts where he was responsible for attending to all of J.P.'s basic needs.

14.     Defendant Zamel Banks, at all relevant times, was an ASP employed by Life's WORC and assigned to the East Islip group home. He was responsible for providing disability care to J.P., including in one-on-one shifts where he was responsible for attending to all of J.P.'s basic needs.

15.    Defendant Devonnie Davis at all relevant times, was an ASP employed by Life's WORC and assigned to the East Islip group home. He was responsible for providing disability care to J.P., including in one-on-one shifts where he was responsible for attending to all of J.P.'s basic needs.

16.    Defendants Amegah, Paulino, Banks, and Davis are collectively referred to herein as the "ASP Defendants."

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

18.    The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

19.    Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Suffolk County, New York, within the Eastern District of New York, and because Defendant maintains its principal place of business in this District.

## JURY DEMAND

20.    Plaintiff demands trial by jury in this action.

## FACTS

21.    At all relevant times, J.P. lived in the East Islip residential home operated by Life's WORC, along with five other men with intellectual disabilities and/or autism.

22.    Due to his severe autism, J.P. requires constant, one-on-one support for every aspect of daily living. This includes assistance with meal preparation, eating, brushing his teeth, dressing, laundering his clothing, managing hygiene, and social interaction throughout the day.

23.    Life's WORC, through its employees the Supervisory Defendants and the ASP Defendants,[1] was responsible for providing J.P. with this basic care, pursuant to state regulations, federal disability rights laws, and its own internal policies.

24.    Throughout J.P.'s time at Life's WORC, even his most basic needs were routinely ignored and neglected.

25.    On numerous occasions, J.P.'s mother, V.T., visited him at the East Islip group home, and observed that J.P. was not properly dressed or groomed.

26.    V.T. frequently had to personally assist J.P. with tasks that were the responsibility of Life's WORC caregivers, such as changing his clothes or attending to his hygiene, because staff had failed to do so.

27.    Life's WORC also failed to maintain J.P.'s personal belongings, including essential clothing provided by his mother. Despite V.T.'s regularly purchasing and supplying clothing for J.P., these items would often go missing without explanation.

28.    J.P. frequently lacked appropriate clothing and was often found dressed in a bathing suit rather than pants, even during inappropriate weather conditions.

29.    V.T. estimates that hundreds, if not thousands, of dollars' worth of clothing she provided to Life's WORC for J.P. was lost, unaccounted for, or simply never made available to him.

### Life's WORC's Staff Members Were Required to Provide Proper Disability Care

30.    Life's WORC, through its management-level employees the Supervisory Defendants, was obligated to ensure that staff members assigned to J.P., including the ASP

---

[1] A list of all relevant staff members and management-level employees, as well as their positions during the time period relevant to this action, is available at Appendix A herein.

Defendants, were adequately trained and equipped to provide appropriate care. Life's WORC manifestly failed to do so.

31.     All ASPs employed by Life's WORC were required to complete Strategies for Crisis Intervention and Prevention ("SCIP") training. SCIP is designed to provide staff with tools to understand and address the needs of individuals with intellectual disabilities, developmental disabilities, and autism. SCIP training is intended to teach proactive techniques for crisis prevention, de-escalation strategies, and safe intervention methods that prioritize dignity and safety.

32.     Additionally, ASPs who administer medications are required to be certified as Approved Medication Administration Personnel ("AMAP"), ensuring they understand proper medication protocols and safety standards.

33.     Despite these requirements, Life's WORC routinely employed ASPs who failed to follow SCIP principles and neglected the foundational duties of their roles, including the ASP Defendants. When alerted to the ASP Defendants' failures to follow SCIP principles, Life's WORC, through the Supervisory Defendants, never took corrective action to protect the residents in its custody.

***Defendants' Abuse, Neglect, Assaults, and Overmedication Were Explicitly Motivated by Discriminatory Animus and Not Wanting to "Deal" With J.P.'s Disabilities***

34.     Life's WORC staff routinely abused, assaulted, neglected, and overmedicated J.P., largely because of the nature and severity of his disabilities.

35.     Due to being non-verbal, J.P. requires around the clock one-on-one support to ensure that his needs are being met—even if, due to his disability, he cannot verbalize those needs—and to manage the behavioral manifestations of his disabilities.

36.    For example, J.P. would sometimes hit his head with his hand as a result of stress, anxiety, or frustration due to feeling misunderstood or not cared for. When J.P. hits his head, disability-attuned care would require working with J.P. to understand and rectify the source of his frustration. In appropriate cases, SCIP-compliant de-escalation techniques can be used to ensure that he does not harm himself when hitting himself in the head.

37.    Rather than provide this care, the Supervisory Defendants and ASP Defendants resorted to abuse, assault, neglect, and overmedication to deal with J.P.'s behaviors.

38.    Defendants repeatedly complained to V.T. about J.P.'s disability-related behaviors—*e.g.*, hitting his head as a way to convey frustration without being able to do so verbally—and this discriminatory animus was reflected in their abusive conduct.

39.    As described in fuller detail below, Defendants used significant and SCIP-violative force and went so far as keeping J.P. dangerously drugged, with the intent of not wanting to, in their words, "deal" with J.P.'s disabilities and associated behaviors.

40.    For example, Defendants engaged in a coordinated and systemic campaign to keep J.P. drugged and in a "zombie-like" state. This campaign included Defendants' creating fraudulent medical records to justify maintaining or increasing J.P.'s high medication dosage to keep him sedated because staff would "rather have him sleeping" than "deal" with him. This overmedication—with the knowledge, express encouragement, and even participation by management-level employees, including Defendants Adewunmi, LaBoy, and Dominguez—once led to J.P.'s hospitalization due to being unresponsive.

41.    Similarly, the physical abuse inflicted on J.P. was also motivated by Defendants' explicit desire to avoid having to "deal" with his disabilities. For example, instead of trying to address the source of his frustration or, when needed, using appropriate SCIP de-escalation

techniques when J.P. would hit himself in the head, Defendant Amegah routinely restrained J.P. by tying his shirt sleeves as if he were in a straitjacket and frequently gripped his arms so tightly that bruises and fingerprint inlays were visible to other ASPs.

42.    In another instance of physical abuse motivated by not wanting to "deal" with J.P.'s disabilities, Defendant Paulino assaulted J.P. in his bedroom while J.P. was having difficulty sleeping and leaving his bedroom, attempting to express a need to be attended to by staff. Instead of providing disability care and attending to whatever that need was, Paulino took J.P. into his bedroom, closed the door behind him, stayed in J.P.'s bedroom for approximately two to three minutes, and came back out of the room. J.P. did not get back up out of his bed afterwards, and the next morning, J.P. had a black eye. In short, Paulino beat J.P.

43.    J.P. was entitled to be cared for in an environment free from discrimination due to his disability. Defendants did the exact opposite.

***Multiple Staff Members at the East Islip Home Repeatedly Neglect, Abuse, and Physically Assault J.P., as Early as 2022***

44.    J.P.'s abuse at the hands of Life's WORC staff dates back to at least in or around October 2022.

45.    In or around October 2022, a staff member named Jelani punched J.P. in the ribs while another staff member, ASP Joseph Rannazzisi, was present. Jelani faced no meaningful disciplinary action beyond a brief suspension and was permitted to return to work.

46.    Around the same time, another staff member named Clarissa restrained J.P. in a physically improper way and punched him in the head, in violation of SCIP protocol. Clarissa had previously slapped another resident in front of Rannazzisi and then-Assistant Residential Manager Defendant Dominguez.

47.     In November 2022, Defendant Amegah inappropriately restrained J.P. and shoved him forcefully onto his bed. A video of the incident captured J.P. in visible and audible distress.

48.     In December 2022, Defendant Banks raised his hand to strike J.P. and only stopped when he saw that Rannazzisi was watching. No one intervened to prevent future threats.

49.     These incidents, which Rannazzisi reported to then-Residential Manager Defendant LaBoy, resulted in no meaningful intervention or disciplinary consequences. Jelani returned to work, and Clarissa and Banks continued unsupervised.

***Staff Members Routinely Violate Life's WORC Staffing Policy and Use Marijuana on the Job***

50.     In addition to the escalating physical abuse, Life's WORC staff at the East Islip home routinely violated company policy and risked residents' safety. Life's WORC requires a minimum ratio of one staff member per two residents in the East Islip home. But staff members would frequently sleep when they were meant to be supervising residents, and even worse, staff would often leave the East Islip group home to smoke marijuana in their cars, leaving the home understaffed.

51.     For example, Amegah frequently slept while on shift and left residents, including J.P., unattended.

52.     Once, on information and belief, Banks left marijuana between the couch cushions at the East Islip group home. Another employee, Annali Rivera, was among the staff working at the East Islip group home on the day that staff discovered the marijuana. Rivera reported the incident to LaBoy. In response, LaBoy instructed staff to flush the marijuana down the toilet and told them, in sum and substance, that she would "handle it." On information and belief, LaBoy took no disciplinary action against Banks for this incident.

53.     In or around February 2023, Life's WORC hired Defendant Devonnie Davis, a new staff member, who would similarly leave his post during his shift to smoke marijuana in his

car. In or around April 2023, Rannazzisi raised this issue to LaBoy and Dominguez. LaBoy had also previously told Rannazzisi that she had caught Davis smoking marijuana on the job in the past.

54.     On information and belief, LaBoy and Dominguez took no disciplinary action against Davis.

55.     Even though concerned staff reported these incidents to management, Life's WORC did nothing to preserve staffing ratios, prevent staff from showing up to work under the influence of marijuana, or stop staff from leaving their job post to smoke marijuana during their shift. These incidents were early warning signs that threats, abuse, and a lack of accountability would soon spiral out of control at the East Islip home.

***Threats to J.P.'s Safety and Physical Abuse Escalate In 2023***

56.     In February 2023, Amegah kicked J.P. in the waist with enough force to knock him into a chair. This assault was captured on video.



*Figure 1: Screenshot of Mr. Amegah kicking J.P.*

57.    Rivera reported the incident to LaBoy and Dominguez, who instead of disciplining Amegah, defended his assault. LaBoy and Dominguez attributed the abuse to "burnout" and mental health struggles. No corrective action was taken, and management instead justified and covered up this physical abuse.

58.    Also in February 2023, Banks verbally abused J.P. during a behavioral episode, instructing J.P. to do pushups and jumping jacks and threatening him to "get the fuck up or I'll make you get up," and calling him the N-word. Dominguez was present during this incident and did nothing to stop Banks. Instead, she joined in, flicking J.P. in the face and forcefully twisting his arms behind his back in a painful restraint.

59.    Rivera reported the incident to both LaBoy and then-Director of Residential Services, Defendant Adewunmi. Adewunmi dismissed the concern.

60.    Neither Banks nor Dominguez was suspended or otherwise disciplined. Both remained in direct contact with J.P.

61.    In March 2023, Rivera observed Amegah aggressively restraining another resident while another staff member named Danielle slapped that same resident. Rivera captured the incident on video and provided the video to LaBoy.

62.    In response, LaBoy instructed Rivera not to inform Dominguez about the incident, as Dominguez was at her baby shower. LaBoy also instructed Rivera and others not to report the incident to the Justice Center for the Protection of People With Special Needs ("Justice Center"), a New York State agency responsible for investigating allegations of abuse or neglect of individuals with special needs. LaBoy further instructed Rivera that she should lie to the Justice Center if ever asked about this incident and to tell the Justice Center that no one had reported the incident to any managers.

63.     On information and belief, despite LaBoy's instruction, the video of Amegah and Danielle's abuse was ultimately sent and viewed by Dominguez during her baby shower, and by Adewumni, who was also in attendance. Although Danielle was terminated a week later, Amegah faced no consequences.

***More Abuse, Sham Investigations, and Management Cover-Ups for a Serial Offender***

64.     During this same time period, on information and belief, Amegah regularly smoked marijuana while at work, or slept when he was meant to be supervising residents.

65.     In the presence of other ASPs, such as Alexis Langomas, Amegah also frequently restrained J.P. by tying his shirt sleeves as if he were in a straitjacket, and frequently gripped his arms so tightly that bruises and fingerprint inlays were visible to Langomas and other ASPs when they showered J.P.

66.     Again, this was an improper and abusive attempt to deal with J.P.'s disability-related behaviors. Rather than handle J.P.'s behaviors in a caring, humane, or professional way, staff would drug him, sedate him, straightjacket him, or control him by beating him.

67.     On multiple occasions, Amegah would take J.P. into private rooms and close the door behind him, and J.P.'s screams could be heard by others.

68.     On another occasion in May 2023, Amegah slapped J.P. during a one-on-one assignment in the presence of other staff members, including Langomas and Rivera.

69.     Although Amegah admitted to the slap, Adewunmi ran a sham internal investigation designed to exonerate him. Aside from taking cursory statements from those who witnessed the incident, Life's WORC management's "investigation" was perfunctory and meant to justify management's inaction against Amegah.

70.     For example, Adewunmi discredited Langomas's account of Amegah slapping J.P., saying, in sum and substance, that because J.P. is self-injurious, he doubted that Amegah would have slapped him (though Amegah later admitted to doing so).

71.     When giving her statement as a witness to this incident, Rivera re-raised the February 2023 incident involving Amegah kicking J.P., and showed LaBoy and Adewunmi the videos of that incident. LaBoy and Adewunmi again excused Amegah's abuse, stating that Amegah was "going through a lot." LaBoy and Adewunmi justified the incident by saying, in sum and substance, that Amegah "didn't know his own strength" and that he was a "big guy."

72.     LaBoy and Adewunmi then video-conferenced Defendant DiVita, Life WORC's Senior Vice President of Residential Services, into the meeting with Rivera. Rivera showed DiVita the videos of Amegah's abuse. On information and belief, instead of taking other action to discipline Amegah or to protect J.P., DiVita only offered to post flyers in the East Islip group home for an Employee Assistance Program to help with Amegah's ostensible "burnout." After the incident, management gave Amegah a few days off work before he returned to his normal work schedule.

***News 12 Long Island Exposes the Abuse, and Life's WORC Frantically Conspires to Cover Up Their Negligence***

73.     In the summer of 2023, the videos of Amegah kicking J.P. and inappropriately restraining another resident began circulating among staff and parents of residents at the East Islip group home—the exact same videos that had already been raised to Adewunmi, DiVita, LaBoy, and Dominguez (who herself had physically assaulted J.P.).

74.     Life's WORC management again chose conspiracy over accountability. On information and belief, LaBoy instructed at least one employee to delete the videos. Adewunmi,

LaBoy, and DiVita focused on damage control by speaking with furious parents of residents who had received the videos to try and track down the source of the leaked videos.

75.    On or around the day before News 12 Long Island ran a story featuring the two videos—and while reporters were outside the East Islip home—management feverishly worked to cover up their tracks.

76.    Adewunmi and DiVita held meetings with Rannazzisi and Rivera and forced them to delete the videos and any text messages they had sent to LaBoy and Dominguez regarding staff members' abuse of residents. Adewunmi and DiVita forced the employees to physically show them their phone screens as they deleted the evidence from their phones (including deleting evidence from the "Recently Deleted" folder on their iPhones, ensuring they would be permanently destroyed). They also angrily admonished an employee for taking and sending the videos.

77.    Adewunmi and DiVita's cover up was unsuccessful. On or around June 6, 2023, News 12 ran a story featuring the videos.

78.    After the story aired, Life's WORC found their scapegoats, firing LaBoy and Dominguez to protect management and executive-level employees. Life's WORC only did so after a New York State auditor began investigating following News 12's story.

79.    Worse yet, Life's WORC *promoted* Adewunmi to work in the organization's corporate headquarters as Vice President of Autism Services.

80.    DiVita remains employed at Life's WORC.

81.    Life's WORC also fired the employees involved in speaking out and bringing the abuse to light.

***After the News 12 Report, Staff Continue to Physically Abuse J.P.***

82.    Even after the News 12 report, Life's WORC staff continued abusing J.P. with near-impunity.

83.    In September 2023, Defendant Paulino assaulted J.P. in his bedroom while J.P. was having difficulty sleeping and continuously leaving his bed. Paulino took J.P. into his bedroom, closed the door behind him, stayed in J.P.'s bedroom for approximately two to three minutes, and came back out of the room. J.P. did not get back up out of his bed afterwards. The next morning, J.P. had a black eye.



*Figure 2 – J.P.'s black eye*

84.    In October 2023, while riding in a Life's WORC van during an outing away from the East Islip home, Paulino punched J.P. in the face, causing an injury that required multiple stitches.

85.    The employees in the front of the van heard a thump from the backseat, at which time Paulino said, in sum and substance, "oh shit, he's bleeding, he's bleeding." The ASPs in the front seats, including Langomas, then turned around to help stop the bleeding.

86.    According to Langomas, Paulino claimed that J.P. was bleeding because he hit himself on a part of the van—despite the fact that where J.P. was sitting was smooth and did not have any sharp objects or edges that could have caused the split eye that J.P. suffered. Rather, J.P.'s injuries make plain that he was punched, requiring multiple stitches.



*Figure 2 – J.P.'s stitches*

***Life's WORC Staff Routinely Neglected J.P.'s Medical Needs and Overmedicated Him to Try and Sedate Him***

87.    Throughout his time at the East Islip home, Life's WORC staff also neglected J.P.'s medical needs.

88.    In February 2024, J.P. was hospitalized for approximately 20 days due to extreme constipation and pain. A metal object was found lodged in his colon, raising serious questions about staff supervision and basic hygiene. Life's WORC staff had never taken J.P. for a

colonoscopy despite him having previously suffered severe constipation for a long period of time.

89.     In July 2024, J.P. was taken to urgent care for still-undisclosed reasons, and Life's WORC never informed his mother or documented the medical event.

90.     Separate from the flagrant physical and verbal abuse, negligent conduct, and cover-ups detailed above, Life's WORC management routinely instructed staff to exaggerate or invent behavioral issues to justify maintaining or increasing J.P.'s high medication dosage because they did not want to, in their words, "deal" with J.P. and the level of care and attention he required. In so doing, Life's WORC fraudulently fabricated medical records to keep J.P. overmedicated and sedated.

91.     Adewunmi, LaBoy, Dominguez frequently encouraged staff to falsify records to justify J.P.'s high medication dosage. Danasia Jones—an assistant manager at another Life's WORC home who became more involved in managing the East Islip group home after LaBoy and Dominguez were fired—also encouraged this scheme.

92.     On information and belief, Life's WORC's general medication protocol involves staff members documenting residents' behavioral issues in a logbook in order to justify the maintenance or increase of a residents' medication dosage.

93.     In J.P.'s case, staff members were responsible for documenting the number of times he hit himself when he became anxious or overwhelmed to help assess whether J.P.'s medication dosage was appropriate.

94.     Management instructed staff to manipulate these medical records. On information and belief, on certain days where J.P. did not hit himself at all, management would instruct ASPs to invent incidents of J.P. hitting himself.

95.     LaBoy once told Langomas, in sum and substance, "write anything, it doesn't matter."

96.     On information and belief, Dominguez also frequently instructed staff members to, in sum and substance, "report something" in the logbook, even if there was nothing to report.

97.     Management would instruct staff to write specific numbers (*e.g.*, 100 times) that were high enough to justify more medication, but not too high to be, in their view, unrealistic. On information and belief, Dominguez would sometimes use a different pen and handwriting to forge records in the logbook herself.

98.     Adewunmi, LaBoy, and Dominguez also conveyed similar instructions in monthly staff meetings.

99.     Life's WORC management was clear about their goals in falsifying these records: they preferred to keep J.P. drugged rather than deal with his behavioral needs.

100.    As a result, Life's WORC routinely intentionally overmedicated J.P.

101.    On certain days, he was so heavily medicated that he was drooling.

102.    On other days, LaBoy and Dominguez encouraged staff to keep J.P. medicated and sleeping—sometimes as late as 1:00 p.m.—because he would be difficult to "deal" with if awake, and they would instead "rather have him sleeping."

103.     On one occasion, J.P. was hospitalized due to being overmedicated, and had to be carried out of his home by medical personnel while unresponsive and strapped to a wheelchair.




*Figure 4 – J.P.'s hospitalization*                  *Figure 5 – J.P. Strapped to Wheelchair*

104.    As a result of the fraudulent logbook entries, J.P.'s medication dosage increased. Some ASPs became concerned when he would be sleeping all day, drooling, or slouched over due to his high dosage.

105.    But management preferred that to ensuring that J.P. received proper care and attention.

106.    For example, on information and belief, Rannazzisi raised such concerns on more than one occasion with Adewunmi, LaBoy, and/or Dominguez, who would dismiss the concerns by saying that J.P. was "adjusting" to a new dosage—even though this "adjustment" period lasted weeks on end.

107. Finally, Life's WORC staff routinely committed medication errors at the East Islip group home, such as giving a certain medication to the wrong resident or failing to give medications entirely.

108. Medication errors are supposed to be logged in a logbook. According to AMAP training, committing three errors should result in the staff member losing their AMAP certification.

109. However, Life's WORC management routinely refused to log medication errors.

110. In addition, on information and belief, residential nurses employed by Life's WORC would come into the East Islip group home once or twice per week to change or remove medication errors from the logbook. Nurses would also cover for certain staff members, based on their personal friendships, when those staff members committed medication errors.

111. As a result, Life's WORC frequently botched residents' medication, while systematically conspiring to cover up their errors.

### J.P. Leaves Life's WORC's Residential Program and Further Neglect is Uncovered

112. Due to the extreme risk to J.P.'s safety and security, V.T. spent months trying to secure alternative housing and daily care and assistance for her son. Not only did Life's WORC stonewall the process at every given opportunity, but when J.P. finally left Life's WORC's residential program, V.T. discovered additional signs of past abuse and neglect.

113. For example, Life's WORC insisted that J.P. was banging his head against the wall and that he needed to wear a helmet, which caused significant delays in transferring J.P. to a new home, as other residential programs had to ensure that they had capacity to accommodate an individual with that alleged behavioral response.

114. On September 5, 2024, J.P. was finally able to move to a different residential home.

115.    On September 6, 2024, J.P. ripped the helmet off his head and refused to wear one.

116.    Since then, J.P. has not worn a helmet and has not had any issues banging his head against the wall, indicating that any instances of him doing so while in the East Islip group home represented a cry for help, and a product of the abuse he was experiencing.

117.    Further, when J.P. was evaluated by his primary care physician when transferring homes, V.T. learned that Life's WORC had never informed J.P.'s physician about the physical abuse he suffered, and that the primary care physician had not previously known about the abuse.

118.    On September 10, 2024, the physician discontinued J.P.'s use of a helmet, and recommended "monitoring due to PTSD."

119.    J.P. suffered heinous abuse while in the care and custody of Life's WORC. Information from staff, photos, videos, and additional evidence shows the abuse, mismanagement, and neglect that Life's WORC's management and executive-level employees routinely encouraged, and conspired to cover up once discovered.

120.    As a result of the above, J.P. has endured years of horrific physical, emotional, and psychological suffering.

**FIRST CAUSE OF ACTION**
**(Against Defendant Life's WORC)**
**Americans with Disabilities Act (42 U.S.C. § 12101 et seq.)**
**Discrimination on the Basis of Disability**
**Denial of Reasonable Accommodations**

121.    Plaintiff repeats and realleges the foregoing factual allegations as if the same were fully set forth at length herein.

122.    The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., prohibits discrimination against qualified individuals with disabilities by places of public accommodation.

123.    J.P. is a qualified individual with a disability as defined in 42 U.S.C. § 12102(1), having a mental impairment that substantially limits one or more major life activities.

124.    Defendant Life's WORC is a place of public accommodation subject to the requirements of the ADA.

125.    J.P. was qualified to participate in or benefit from the services, programs, and activities, provided by Defendants.

126.    Rather than provide appropriate disability care, Defendant Life's WORC, through the Supervisory and ASP Defendants, abused, assaulted, neglected, and overmedicated J.P., motivated in substantial part due to the nature and severity of his disabilities. Defendants consistently complained to V.T. about J.P.'s disability-related behavioral difficulties—*e.g.*, hitting his head as a way to convey frustration without being able to do so verbally—and this discriminatory animus was reflected in their abusive conduct.

127.    Defendant Life's WORC, through the Supervisory and ASP Defendants used significant and SCIP-violative force and went so far as keeping J.P. dangerously drugged, with the express and explicit intent of not wanting to, in their words, "deal" with J.P.'s disabilities and the behavioral manifestations thereof. Defendants created fraudulent medical records to justify maintaining or increasing J.P.'s high medication dosage so as to not have to, in their words, "deal" with him and his behavioral needs, preferring to keep him sedated because staff would "rather have him sleeping." This overmedication—with the knowledge, express encouragement, and even participation by Defendants Adewunmi, LaBoy, and Dominguez—once led to J.P.'s hospitalization due to being unresponsive.

128.    The physical abuse inflicted on J.P. was also motivated by Defendants' explicit desire to avoid having to "deal" with his disabilities. Instead of trying to address the source of his

frustration or, when needed, using appropriate SCIP de-escalation techniques when J.P. would hit himself in the head, Defendant Amegah routinely restrained J.P. by tying his shirt sleeves as if he were in a straitjacket—contrary to SCIP protocol—and frequently gripped his arms so tightly that bruises and fingerprint inlays were visible to other ASPs.

129.    In another exemplary instance of physical abuse being motivated by not wanting to "deal" with J.P.'s disabilities, Defendant Paulino assaulted J.P. in his bedroom while J.P. was having difficulty sleeping and continuously leaving his bedroom, attempting to express a need to be attended to by staff. Instead of providing disability care and attending to whatever that need was, Paulino took J.P. into his bedroom, closed the door behind him, stayed in J.P.'s bedroom for approximately two to three minutes, and came back out of the room. J.P. did not get back up out of his bed afterwards, and the next morning, J.P. had a black eye.

130.    Defendant Life's WORC, through the Supervisory and ASP Defendants, discriminated against J.P. on the basis of disability. The above-alleged abusive conduct was either tacitly approved (through cover-ups and lack of discipline) or expressly encouraged by Defendants DiVita, Adewunmi, LaBoy, and Dominguez, all so that Life's WORC would not have to provide him the opportunity to participate in Life's WORC's activities, programming, and one-on-one care systems due to the nature of his disabilities.

131.    Defendant Life's WORC, through the Supervisory and ASP Defendants, failed to make reasonable modifications in policies, practices, or procedures when such modifications were necessary to avoid discrimination on the basis of disability, in violation of 42 U.S.C. § 12182(b)(2)(A) and applicable ADA regulations.

132.    As a direct and proximate result of Defendants' conduct, J.P. has suffered significant damages, including but not limited to physical harm and emotional distress.

133.    Defendants' conscious disregard for J.P.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

134.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

### SECOND CAUSE OF ACTION
**(Against Defendant Life's WORC)**
**Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**Discrimination on the Basis of Disability**
**Denial of Reasonable Accommodations**

135.    Plaintiff repeats and realleges the foregoing factual allegations as if the same were fully set forth at length herein.

136.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibits discrimination against qualified individuals with disabilities by institutions whose programs or activities receive federal financial assistance.

137.    J.P. is a qualified individual with a disability as defined in 29 U.S.C. § 705(20)(B), having a mental impairment that substantially limits one or more major life activities.

138.    Defendant Life's WORC is an institution whose programs or activities receive federal financial assistance within the meaning of 29 U.S.C. § 794(b), and is therefore subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act.

139.    J.P. was qualified to participate in or benefit from the services, programs, and activities, provided by Defendants.

140.    Rather than provide appropriate disability care, Defendant Life's WORC, through the Supervisory and ASP Defendants, abused, assaulted, neglected, and overmedicated J.P., motivated in substantial part due to the nature and severity of his disabilities. Defendants consistently complained to V.T. about J.P.'s disability-related behavioral difficulties—*i.e.*,

hitting his head as a way to convey frustration without being able to do so verbally—and this discriminatory animus was reflected in their abusive conduct.

141.    Defendant Life's WORC, through the Supervisory and ASP Defendants, used significant and SCIP-violative force and went so far as keeping J.P. dangerously drugged, with the express and explicit intent of not wanting to, in their words, "deal" with J.P.'s disabilities and the behavioral manifestations thereof. Defendants created fraudulent medical records to justify maintaining or increasing J.P.'s high medication dosage so as to not have to, in their words, "deal" with him and his behavioral needs, preferring to keep him sedated because staff would "rather have him sleeping." This overmedication—with the knowledge, express encouragement, and even participation by Defendants Adewunmi, LaBoy, and Dominguez—once led to J.P.'s hospitalization due to being unresponsive.

142.    The physical abuse inflicted on J.P. was also motivated by Defendants' explicit desire to avoid having to "deal" with his disabilities. Instead of trying to address the source of his frustration or, when needed, using appropriate SCIP de-escalation techniques when J.P. would hit himself in the head, Defendant Amegah routinely restrained J.P. by tying his shirt sleeves as if he were in a straitjacket—contrary to SCIP protocol—and frequently gripped his arms so tightly that bruises and fingerprint inlays were visible to other ASPs.

143.    In another exemplary instance of physical abuse being motivated by not wanting to "deal" with J.P.'s disabilities, Defendant Paulino assaulted J.P. in his bedroom while J.P. was having difficulty sleeping and continuously leaving his bedroom, attempting to express a need to be attended to by staff. Instead of providing disability care and attending to whatever that need was, Paulino took J.P. into his bedroom, closed the door behind him, stayed in J.P.'s bedroom for

approximately two to three minutes, and came back out of the room. J.P. did not get back up out of his bed afterwards, and the next morning, J.P. had a black eye.

144.    Defendant Life's WORC, through the Supervisory and ASP Defendants, discriminated against J.P. on the basis of disability. The above-alleged abusive conduct was either tacitly approved (through cover-ups and lack of discipline) or expressly encouraged by Defendants DiVita, Adewunmi, LaBoy, and Dominguez, all so that Life's WORC would not have to provide him the opportunity to participate in Life's WORC's activities, programming, and one-on-one care systems due to the nature of his disabilities.

145.    Through these actions, Defendant Life's WORC, through the Supervisory and ASP Defendants, denied J.P. meaningful access to and excluded him from participation in disability services, and failed to provide reasonable accommodations for his disabilities.

146.    Defendant Life's WORC, through the Supervisory and ASP Defendants, failed to implement reasonable modifications or accommodations that would have allowed J.P. equal and meaningful access to its programs or services, despite having knowledge of J.P.'s disability and the necessity of such accommodations.

147.    As a direct and proximate result of Defendant Life WORC's conduct, through the conduct of the Supervisory and ASP Defendants, J.P. has suffered significant damages, including but not limited to physical harm and emotional distress.

148.    Defendant Life's WORC's conscious disregard for J.P.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

149.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

### THIRD CAUSE OF ACTION
**Negligence and Gross Negligence (Against the Supervisory Defendants & ASP Defendants)**
**Vicarious Liability (Against Defendant Life's WORC)**

150.    Plaintiff repeats and realleges the foregoing factual allegations as if the same were fully set forth at length herein.

151.    At all relevant times, Defendants owed J.P. a duty of care and were obligated to protect his safety and security while in Life's WORC custody.

152.    Defendants' negligent conduct breaching that duty of care includes the above-alleged routine physical and verbal abuse, routine understaffing while employees (including Defendants Amegah and Davis) went to smoke marijuana (assuming they were not already under the influence when they showed up to work), and regular and dangerous overmedication to sedate him so as to avoid dealing with his disabilities.

153.    Defendants did so while acting in the scope of their employment—*i.e.*, in the course of being responsible for managing J.P.'s behavior—and in furtherance of Life's WORC's business. Indeed, much of the ASP Defendants' conduct was at the direction of or met with encouragement from or the explicit approval of the Supervisory Defendants, or, at minimum, their tacit approval in their attempts to cover up the misconduct and their failure to take any remedial or disciplinary measures.

154.    The Supervisory Defendants, at various times, were on direct notice of that harmful and abusive conduct, and knew that these staff members were unfit, incompetent, dangerous, or otherwise likely to engage in conduct that would cause harm, and that such harm was reasonably foreseeable.

155.    Defendants failed to take reasonable steps to prevent the foreseeable harm.

156.    The Supervisory Defendants and the ASP Defendants are liable for their own negligence and gross negligence.

157.    Life's WORC is liable for the Supervisory Defendants' and the ASP Defendants' negligence under principles of *respondeat superior*.

158.    As a direct and proximate result of Defendants' conduct, J.P. has suffered significant damages, including but not limited to physical harm, emotional distress, and economic losses.

159.    Defendants' conscious disregard for J.P.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

160.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

## FOURTH CAUSE OF ACTION
### (Against Defendant Life's WORC)
### Negligent Supervision/Training/Discipline/Retention

161.    Plaintiff repeats and realleges the foregoing factual allegations as if the same were fully set forth at length herein.

162.    At all relevant times, Defendant Life's WORC, through the Supervisory Defendants, owed a duty to J.P. to exercise reasonable care in the supervision, training, monitoring, and control of its employees, agents, or individuals under its control, to prevent foreseeable harm to others, including J.P.

163.    Defendant Life's WORC, through the Supervisory Defendants knew that various staff members, including the ASP Defendants, had actively physically harmed and overmedicated J.P.—indeed, the Supervisory Defendants at various times participated in or encouraged the physical abuse and overmedication campaign.

164.    Defendant Life's WORC, through the Supervisory Defendants, was, at various times, put on direct notice of that harmful and abusive conduct, and knew that the ASP

Defendants were unfit, incompetent, dangerous, or otherwise likely to engage in conduct that would cause harm, and that such harm was reasonably foreseeable.

165.    Despite this knowledge, Defendant Life's WORC, through the Supervisory Defendants, failed to adequately supervise, train, investigate, or discipline such individuals, and failed to take appropriate steps to prevent or mitigate the risk of harm to others.

166.    Rather, in response to direct reports of staff member abuse, Defendant Life's WORC, through the Supervisory Defendants, swept the issues under the rug and failed to take remedial or disciplinary measures, prioritizing personal friendships with staff members over the safety of their residents.

167.    In some instances, the Supervisory Defendants participated in the abusive conduct themselves, made excuses for staff members who engaged in abusive conduct, or, at minimum, tacitly approved their actions in failing to take any remedial or disciplinary action.

168.    These instances of cover-up, participation in abuse, justifying abusive behavior, and/or tacitly approving the abuse include, but are not limited to:

    a.    LaBoy and Dominguez routinely refusing to discipline Banks, Clarissa, or Amegah when notified of their inappropriate restraints and physical abuse of J.P.;

    b.    LaBoy instructing staff to flush marijuana down the toilet that Banks had left between the couch cushions and that other staff members discovered, and taking no disciplinary, corrective, or other action;

    c.    LaBoy and Dominguez refusing to discipline, train, or otherwise take corrective action with regards to staff member Devonnie Davis for routinely leaving his post to smoke marijuana in his car;

    d.  Dominguez failing to intervene or discipline Banks for verbally threatening J.P., instead joining in and using inappropriate force on J.P. by flicking his face and forcefully twisting his arms behind his back;

    e.  LaBoy and Adewunmi dismissing the concern of another ASP who witnessed Dominguez and Banks in the above incident, taking no disciplinary, corrective, or other action;

    f.  LaBoy instructing an ASP to lie to the Center regarding abuse the ASP had witnessed;

    g.  Adewunmi running a sham internal investigation to exonerate Amegah regarding having slapped J.P., despite Amegah admitting to doing so;

    h.  Adewunmi, LaBoy, and DiVita, instead of taking other action to discipline Amegah or to protect J.P., offering only to post flyers in the East Islip home for an Employee Assistance Program to help with Amegah's ostensible "burnout," and justifying Amegah's abuse, saying he was ostensibly "going through a lot," that Amegah "didn't know his own strength," and that he was a "big guy"; and

    i.  When videos of abuse surfaced to parents and to the press, Adewunmi and DiVita forcing employees to delete videos and text messages regarding staff member abuse from their phones, rather than take any disciplinary, corrective, or other action.

169.   Defendant Life's WORC's and the Supervisory Defendants' breach of their duty of care in the supervision and control of their employees was a direct and proximate cause of the injuries and damages sustained by Plaintiff.

170.    As a direct and proximate result of Defendants' conduct, J.P. has suffered

significant damages, including but not limited to physical harm, emotional distress, and

economic losses.

171.    Defendants' conscious disregard for J.P.'s safety was willful, malicious, and

cruel, meriting substantial punitive damages.

172.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees,

and any other relief permitted by law.

**FIFTH CAUSE OF ACTION**
**Assault and Battery (Against Defendants Dominguez, Paulino, Amegah, and Banks)**
**Vicarious Liability (Against Defendant Life's WORC)**

173.    Plaintiff repeats and realleges the foregoing factual allegations as if the same were

fully set forth at length herein.

174.    Defendant Life's WORC's employees, while employed by Life's WORC and

acting within the course and scope of such employment, engaged in the above-alleged acts

constituting assault and/or battery under New York law, including but not limited to the

following above-alleged conduct:

a.    Amegah's physical abuse through inappropriate restraints;

b.    Amegah shoving J.P. forcefully onto his bed;

c.    Banks threatening J.P. with physical force;

d.    Amegah kicking J.P. in the waist hard enough to knock him into a chair;

e.    Banks threatening J.P. verbally, saying "get the fuck up or I'll make you get up,"
      and calling him the N-word;

f.    Dominguez joining in with Mr. Banks in the above incident, flicking J.P. in the
      face and forcefully twisting his arms behind his back in a painful restraint;

g.    Amegah restraining J.P. by tying his shirt sleeves as if he were in a straitjacket;

    h.   Amegah gripping J.P.'s arms so tightly so as to cause bruises and fingerprint inlays;

    i.   Amegah slapping J.P.;

    j.   Paulino giving J.P. a black eye; and

    k.   Paulino punching J.P. in the face, causing an injury that required multiple stitches.

175.   These incidents of assault and/or battery occurred during the course of Defendants' assigned duties or were reasonably incidental to the performance of those duties.

176.   Defendant Life's WORC, through the Supervisory Defendants, was, at various times, put on direct notice of that harmful and abusive conduct, and knew that these staff members were unfit, incompetent, dangerous, or otherwise likely to engage in conduct that would cause harm, and that such harm was reasonably foreseeable.

177.   Defendant Life's WORC and the Supervisory Defendants failed to take reasonable steps to prevent the foreseeable harm. Rather, these incidents of assault and battery were either explicitly encouraged by supervisory and executive-level staff, justified and excused by the same, or, at minimum, tacitly approved by supervisory and executive-level staff in their attempts to cover up the misconduct and their failure to take any remedial or disciplinary measures.

178.   Defendants Dominguez, Paulino, Amegah, and Banks are liable for their own assaults and/or batteries of J.P.

179.   Life's WORC is liable for Defendants Dominguez's, Paulino's, Amegah's, and Banks's assaults and/or batteries under principles of *respondeat superior*.

180.    As a direct and proximate result of Defendants' conduct, J.P. has suffered significant damages, including but not limited to physical harm and emotional distress.

181.    Defendants' conscious disregard for J.P.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

182.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

### EIGHTH CAUSE OF ACTION
**(Against All Defendants)**
**Discrimination in Violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2)**

183.    Plaintiff repeats and realleges the foregoing factual allegations as if the same were fully set forth at length herein.

184.    Defendants' conduct as hereinbefore described discriminates in the provision of services or facilities in connection with a dwelling because of disability, in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2).

185.    Rather than provide appropriate disability care in connection with J.P.'s dwelling, Defendants abused, assaulted, neglected, and overmedicated J.P., motivated in substantial part due to the nature and severity of his disabilities. Defendants consistently complained to V.T. about J.P.'s disability-related behavioral difficulties—*i.e.*, hitting his head as a way to convey frustration without being able to do so verbally—and this discriminatory animus was reflected in their abusive conduct.

186.    Defendants discriminated against J.P. on the basis of disability. The above-alleged abusive conduct was either tacitly approved (through cover-ups and lack of discipline) or expressly encouraged by Defendants DiVita, Adewunmi, LaBoy, and Dominguez, all so that Life's WORC would not have to provide him disability services in connection with J.P.'s dwelling.

33

187.    Through these actions, Defendants denied J.P. meaningful access to and excluded him from participation in disability services, and failed to provide reasonable accommodations for his disabilities.

188.    As a direct and proximate result of Defendants' conduct, J.P. has suffered significant damages, including but not limited to physical harm and emotional distress.

189.    Defendants' conscious disregard for J.P.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

190.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

**NINTH CAUSE OF ACTION**
**(Against All Defendants)**
**Discrimination in Violation of New York State Human Rights Law**

191.    Plaintiff repeats and realleges the foregoing factual allegations as if the same were fully set forth at length herein.

192.    At all relevant times, Life's WORC's East Islip group home was a "housing accommodation" as defined by N.Y. Executive Law § 292(10) and a "publicly-assisted housing accommodation" as defined by N.Y. Executive Law § 292(11).

193.    At all times relevant hereto, the Supervisory Defendants and ASP Defendants were agents and/or employees of Life's WORC, the East Islip group home's owner, lessee, sub-lessee, assignee, and/or managing agent, and/or were agents and/or employees of some other person having the right to sell, rent, or lease a housing accommodation.

194.    J.P. is disabled within the meaning of the New York State Human Rights Law.

195.    Defendants' conduct as hereinbefore described discriminates in the provision of services related to a housing accommodation, in violation of New York State Human Rights Law.

196.     Rather than provide appropriate disability care in connection with J.P.'s dwelling, Defendants abused, assaulted, neglected, and overmedicated J.P., motivated in substantial part due to the nature and severity of his disabilities. Defendants consistently complained to V.T. about J.P.'s disability-related behavioral difficulties—*e.g.*, hitting his head as a way to convey frustration without being able to do so verbally—and this discriminatory animus was reflected in their abusive conduct.

197.     Defendants discriminated against J.P. on the basis of disability. The above-alleged abusive conduct was either tacitly approved (through cover-ups and lack of discipline) or expressly encouraged by Defendants DiVita, Adewunmi, LaBoy, and Dominguez, all so that Life's WORC would not have to provide him disability services in connection with J.P.'s dwelling.

198.     Through these actions, Defendants denied J.P. meaningful access to and excluded him from participation in disability services, and failed to provide reasonable accommodations for his disabilities.

199.     As a direct and proximate result of Defendants' conduct, J.P. has suffered significant damages, including but not limited to physical harm and emotional distress.

200.     Defendants' conscious disregard for J.P.'s safety was willful, malicious, and cruel, meriting substantial punitive damages.

201.     Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and any other relief permitted by law.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff V.T., as guardian ad litem of her son, J.P., respectfully requests judgment against Defendants as follows:

1. Awarding compensatory damages in an amount to be determined at trial.

2. Awarding punitive damages in an amount to be determined at trial.

3. Awarding attorneys' fees, costs, and disbursements in an amount to be determined at trial.

4. Awarding prejudgment interest in an amount to be determined at trial.

5. Directing such other and further relief as the Court may deem just and proper.

Dated: July 9, 2025
         New York, New York

                              EMERY CELLI BRINCKERHOFF ABADY
                              WARD & MAAZEL, LLP

                              _____/s/_____
                              Ilann M. Maazel
                              Eric Abrams

                              1 Rockefeller Plaza, 8th Floor
                              New York, New York 10020
                              (212) 763-5000

                              *Attorneys for Plaintiff V.T., as guardian ad
                              litem of her son, J.P.*

## Appendix A

| Staff Member | Position During Relevant Time Period |
|---|---|
| Defendant Andrea DiVita | Senior Vice President of Residential Services |
| Defendant Ayodele Adewunmi | Director of Residential Services |
| Defendant Vanessa Dominguez | Assistant Residential Manager |
| Defendant Tiffany LaBoy | Residential Manager |
| Defendant Devonnie Davis | Autism Support Professional |
| Defendant Ramon Paulino | Autism Support Professional |
| Defendant Bryan Amegah | Autism Support Professional |
| Defendant Zamel Banks | Autism Support Professional |
| Joseph Rannazzisi | Autism Support Professional |
| Annali Rivera | Autism Support Professional |
| Alexis Langomas | Autism Support Professional |
| Clarissa [last name unknown] | Autism Support Professional |
| Jelani [last name unknown] | Autism Support Professional |
| Danielle [last name unknown] | Autism Support Professional |